**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| JAMES A. JACKSON, ) | CASE NO.  1:08-cv-1381 |
| ) | |
| Plaintiff, ) | |
| ) | MAGISTRATE JUDGE VECCHIARELL |
| v ) | |
| ) | |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | **MEMORANDUM OPINION & ORDER** |
| ) | |
| Defendant. | |

Claimant, James A. Jackson ("Jackson"), challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Jackson's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 423 and 42 U.S.C. § 1381(a).  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is AFFIRMED.

**I.  Procedural History**

Jackson filed his applications for SSI on October 5, 2004, alleging disability beginning January 1, 1972.  His application was denied initially and upon

reconsideration. Jackson timely requested an administrative hearing.

Administrative Law Judge ("ALJ"), Edmund Round, held a hearing on September 17, 2007, at which Jackson, who was represented by counsel, and Lynn Smith, certified rehabilitation counselor, testified.  The ALJ issued a decision on January 25, 2008 in which he determined that Jackson was not disabled.  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review. Jackson filed an appeal to this Court.

On appeal, Jackson claims that:  (1) the ALJ erred by failing to grant substantial weight to the opinions of the treating and examining physicians; and (2) the case must be remanded for consideration of equivalency with 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.05(C).  The Commissioner disputes Jackson's claims.

## II. Evidence

### A. Personal and Vocational Evidence

Jackson was born on July 13, 1955.  Transcript ("Tr.") 53.  He was 52 years old at the time of the hearing.  Jackson completed school through the ninth grade.  He has no past relevant work.  (Tr. 96, 98, 420).  Jackson was incarcerated for rape and kidnaping from 1987 through 2004.  (Tr. 19, 97).

### B. Medical Evidence

While incarcerated, Jackson was treated for hypertension, diverticulosis, shingles and chest pain.  (Tr.  105).  On March 7, 2003, Jackson underwent a mental health evaluation after being referred by a cardiologist to rule out an anxiety disorder.  (Tr. 165).   Jackson's cognitive assessment revealed comprehension and calculation consistent with his educational history.  There were no obvious deficits in concentration

or abstraction.  There were some deficits in his remote memory but no apparent deficits in immediate or short-term memory.  (Tr. 167).  It was noted that Jackson had WAIS-R testing in March 2002 which produced a full scale score of 71.  (Tr. 167).  Jackson was diagnosed with alcohol dependence in remission since 1984, mild mental retardation, and antisocial traits.  He was assigned a Global Assessment Functioning ("GAF") score of 65.[1]  (Tr. 167).

On March 31, 2004, Jackson received a chest X-ray that revealed lower lung field aterlectasis or fibrosis.  No acute cardiopulmonary disease was noted.  (Tr. 178).

Jackson presented to the Northeast Ohio Neighborhood Health Services ("NEON") from November 7, 2004 through January 10, 2006 for various complaints including, abdominal pain with tenderness to palpitation (Tr. 249, 251, 275), chest pain (Tr. 250), epigastric pain (Tr. 250), shortness of breath (Tr. 250), dizziness (Tr. 251), blood in his stool (Tr. 251), and sexual dysfunction.  (Tr. 273-274).

On November 17, 2004, Jackson presented to Herschel Pickholtz, Ed.D. at the request of the state agency.  (Tr. 96).  Jackson reported that he had received social security benefits in the past.  (Tr. 96).  He stated that he had completed school through the ninth grade but was expelled.  (Tr. 96).  He stated that he was in special education classes but did not know why.  (Tr. 98).  Dr. Pickholtz opined that Jackson was in

---

[1]. GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning.  A person who scores in this range may have a depressed mood, mild insomnia, or occasional truancy, but is generally functioning pretty well and has some meaningful interpersonal relationships.  *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. revised, 2000).

special education classed because he put forth very little effort and was drinking and carrying on for many years. (Tr. 98). Jackson reported that he never learned how to read. (Tr. 97). He spent much of his adult life in prison. (Tr. 97). Dr. Pickholtz noted that Jackson presented himself as very deteriorated but at times uttered statements that were inconsistent with any mild mental retardation. Dr. Pickholtz attributed this discrepancy to significant exaggeration. (Tr. 98). Dr. Pickholtz opined that Jackson's premorbid levels of functioning were at least at a borderline range. (Tr. 98).

Dr. Pickholtz administered the WAIS-III test which produced a full scale score of 45, a verbal IQ of 50, and a performance IQ of 48. (Tr. 99). Dr. Pickholtz stated that he had, "grave doubts as to the reliability and validity of all the test scores and [Jackson's] overall verbalizations suggested much higher levels of functioning than were noted at the present time and are inconsistent with any retardation in the past." (Tr. 99).

Dr. Pickholtz diagnosed alcohol dependency allegedly in remission; learning disorder, NOS with true levels of functioning falling within the borderline ranges of performance, at worst; reading disorder, NOS; and mixed personality involving narcissistic, oppositional, antisocial, and addictive personality features. Dr. Pickholtz opined that notwithstanding his test scores, Jackson's actual GAF score is 65. (Tr. 101-102).

Dr. Pickholtz opined that Jackson's ability to handle low skilled and unskilled labor falls within the mild range of impairment at worst. His ability to handle pace, consistency, and reliability for low skilled and unskilled labor is mildly impaired, at worst. His overall ability to handle eight-hour work activities relative to the stresses and pressures associated with low skilled and unskilled labor were in the mild to moderate

4

range given his lower intellectual functioning and characterological features.  (Tr. 102).

On January 4, 2005, Michael D Wagner Ph. D. completed a Psychiatric Review Technique for Jackson.  (Tr. 197).  Dr. Wagner diagnosed a learning/reading disorder and a mixed personality disorder.  (Tr. 201, 204).  He opined that Jackson has: 1) mild restriction of activities of daily living: 2) mild difficulties in maintaining social functioning; and 3) mild difficulties in maintaining concentration, persistence, or pace.  (Tr. 207).  Dr. Wagner further opined that Jackson's allegations are exaggerated, and he is not credible.  (Tr. 209).

On April 21, 2005 Jackson presented to  Franklin D. Krause, M.D. for a consultive examination.  (Tr. 214).  Dr. Krause noted that Jackson was born with a congenital abnormality of the right arm resulting in his right arm being considerably shorter than his left arm.  Also, there is little movement about the right shoulder.  Jackson can use his right hand and can grasp, pinch and manipulate.  There is some use of the right elbow, and although pronation and supination are limited, he can flex and extend with some strength.  Dr. Krause diagnosed Jackson with:  1) hypertension, well controlled without medication; 2) history of occasional mid-dorsal spine pain, currently asymptomatic, and 3) congenital abnormality of the right arm.  (Tr. 215).

On April 29, 2005, Jerry Liepack, a medical consultant, completed a Physical Residual Functional Capacity Assessment of Jackson.  (Tr. 222).  Liepack found that Jackson could lift and carry 20 pounds occasionally and 10 pounds frequently.  He could stand or walk for six hours of an eight hour workday; and could sit for six hours of an eight hour work day.  His ability to push and/or pull is unlimited.  (Tr. 223).  Jackson could never balance or crawl.  (Tr. 224).  His ability to reach in all directions is limited.

(Tr. 225).

On May 4, 2005, Bonnie Katz, a medical consultant, completed a Mental Residual Functional Capacity Assessment of Jackson. (Tr. 230). Katz opined that Jackson is moderately limited in his ability to: 1) understand and remember detailed instructions; 2) maintain attention and concentration for extended periods; 3) sustain an ordinary routine without special supervision; 4) complete a normal workday or workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; 5) accept instruction and respond appropriately to criticism from supervisors; 6) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; 7) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and 8) respond appropriately to changes in the work setting. Jackson is markedly limited in his ability to carry out detailed instructions and interact appropriately with the general public. (Tr. 230-231).

Katz also completed a Psychiatric Review Technique on May 4, 2005 in which she opined that Jackson has 1) moderate restrictions of activities of daily living; 2) moderate difficulties in maintaining social functioning; and 3) moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 244).

On August 19, 2005 and October 14, 2005, Jackson presented to the Huron Hospital outpatient department ("Huron Hospital") with stomach pain. He was prescribed pain medication and released. (Tr. 265-269).

On March 3, 2006, Jackson presented to Huron Hospital for chest pain after doing push-ups. A chest X-ray revealed slight streaking near the left CP angle which

6

could be due to fibrotic change or atelectasis.  Jackson's heart and mediastinum appear normal.  (Tr. 288).   Jackson was prescribed Motrin and released.  (Tr. 304-321).

On May 31, 2006, Jackson presented to Huron Hospital with bronchitis.  A chest X-ray revealed no active cardiopulmonary disease.  (Tr. 287).

On June 27, 2007, Jackson presented to the emergency room.  He was diagnosed with irritable bowel syndrome; hypertension, well controlled; and knee pain.  An abdominal CT scan revealed diverticulosis of the descending colon.  (Tr. 344).

On July 17, 2006, Michael Ganz M.D. a treating physician, completed a Medical Source Statement regarding Jackson's physical capacity.  (Tr. 332-333).  Dr. Ganz limited Jackson's lifting to 1-2 pounds due to osteoarthritis in all joints.  He limited Jackson's standing/walking to one to two hours in an eight hour day and one hour without interruption.  He opined that when sitting, Jackson needs to elevate his legs to stool level.  He also opined that Jackson would need to rest approximately every two hours in addition to a morning, lunch, and afternoon break.  Dr. Ganz opined that Jackson could climb, balance, stoop, crouch, kneel, and crawl rarely or not at all.  Reaching, handling, feeling, pushing/pulling, and or fine/gross manipulation could be performed rarely or not at all.  Dr. Ganz further opined that Jackson's impairments resulted in environmental restrictions regarding height, moving machinery, temperature extremes, chemicals, dust, noise, and fumes.  Dr. Ganz noted that Jackson had not been prescribed a cane, walker, brace, TENS unit, or breathing machine.  (Tr.332-333).

Jackson continued to treat with Dr. Ganz from October 16, 2007 through August 27, 2007.  During this time Jackson was treated for migraines (Tr. 364-365, 370), hypertension ( Tr. 365, 370, 374, 377, 380), gastroesophageal reflux disease (Tr. 365,

367, 374, 377), back pain (Tr. 370), abdominal pain (Tr. 368, 379, 397), chest pain (Tr. 373), and chronic diarrhea.  (Tr. 367, 398).

On July 16, 2007, Jackson underwent a colonoscopy and esophagogastroduodenoscopy which revealed a small antral ulcer with diffuse divericula in the colon with sessile polyps in the rectum.  (Tr. 384).

On July 20, 2007, Jackson underwent repair of incarcerated umbilical hernia with mesh.  (Tr. 392).

On August 27, 2007, Dr. Ganz completed a second Medical Source Statement regarding Jackson's physical capacity.  (Tr. 358-359).  Dr. Ganz limited Jackson's lifting to five to seven pounds.  Jackson's standing/walking was limited to one to two hours without interruption, and his sitting was not limited.  Dr. Ganz opined that Jackson could climb, balance, stoop, crouch, kneel, and crawl rarely or not at all.  Reaching, handling, feeling, pushing/pulling, and/or fine/gross manipulation could be performed occasionally.  Dr. Ganz also opined that Jackson's impairments resulted in environmental restrictions regarding height, moving machinery, temperature extremes, chemicals, dust, noise, and fumes.  Dr. Ganz noted that Jackson had not been prescribed a cane, walker, brace, TENS unit, or breathing machine.  (Tr. 358-359).

### C.  Hearing Testimony

Jackson testified that he received SSI benefits from the time he was 17 until he was incarcerated.  (Tr. 411-412).  He stated that he was in special education classes when he was in school.  (Tr. 412).  Jackson attended school through ninth grade but was later expelled.  (Tr. 412).  He does not have a GED or high school equivalent.  (Tr. 412).  Jackson stated that he cannot read or write.  (Tr. 413).  He has never had a

8

driver's license.  (Tr. 416).

Jackson testified that he has pain in his legs and knees.  (Tr. 413).  He also has migraines.  (Tr. 415).  Jackson testified that he has trouble with his memory, and that he does not like to be around people.  (Tr. 418).

Jackson testified that he did not tell the emergency room doctor at Huron Hospital that he did push-ups prior to developing chest pains because he cannot do push-ups.  He stated that the medical records to the contrary are wrong.  (Tr. 418).

The ALJ asked the vocational expert ("VE") to consider a hypothetical worker who is 52 years old with a ninth grade education and no relevant vocational training.  The worker can do light work, specifically, he can sit, stand, or walk for six hours during an eight hour day.  He can lift, carry, push, or pull ten pounds frequently and 20 pounds occasionally.  With his right arm, which is his dominant arm, he cannot reach in any direction.  However, there is no limitation on his reaching with the left arm and no limitation on fine or gross manipulation with his right hand.  The hypothetical worker is precluded from using ladders, ropes, or scaffolds.  He is precluded from tasks that involve crawling; and is limited to simple routine tasks where there is only limited and superficial interaction with the public, and where there are no high production quotas or strict time requirements.  The hypothetical worker has the same work experience as Jackson.  The ALJ then asked the VE whether, considering the hypothetical worker's age, education, work experience, and limitations, there are jobs in the national or regional economy that the worker could do.  (Tr.  420-421).

The VE responded that the hypothetical worker could work as a laundry worker for which there are 3,000 jobs in northeast Ohio, 45,000 jobs in the state, and one

million jobs nationally.  (Tr. 421-422).  He could work as a cleaner for which there are 3,200 jobs in northeast Ohio, 32,000 jobs in the state, and 887,000 jobs nationwide.  He could also work as a stock checker for which there are 1,800 jobs in northeast Ohio, 150,000 jobs in the state, and three million jobs nationwide.  (Tr. 422).

Jackson's counsel then asked the VE to consider whether there are any jobs available for a  hypothetical worker with the same limitations set forth in the ALJ's hypothetical except that the worker would be limited to sedentary work, meaning the worker can lift ten pounds occasionally and five pounds frequently, he can stand two hours out of an eight hour work day, and sit six hours out of an eight hour work day with a sit/stand option. The VE testified that there would be no jobs available for such a worker.  (Tr. 424).

Jackson's counsel next asked the VE to consider whether there would be any jobs available for a hypothetical worker with the same limitations as set forth by the ALJ except that this individual could have no production quotas at all.  The VE responded that there would be no jobs available for such a worker.  (Tr. 424).

### III.  Standard for Disability

A claimant is entitled to receive benefits under the Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and

resource limitations.  20 C.F.R. § 416.1100 and 20 C.F.R. § 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. § 404.1520(d) and 20 C.F.R. §416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

### IV. Summary of Commissioner's Decision

In relevant part, the ALJ made the following findings:

1. Mr. Jackson has not engaged in substantial gainful activity since October 5, 2004, the application date (20 CFR 416.920(b) and 416.971 *et seq*);

2. Mr. Jackson has the following severe impairments: a congenital deformity of the right arm (Exhibits 2F, 7F and 15F at 26); a personality disorder (Exhibits 1F and 2F); borderline intellectual functioning (Exhibits 1F and 2F); and alcoholism in reported remission (Exhibits 1F and 2F) (20 CFR 416.920(c));

3. Mr. Jackson does not have an impairment or combination of impairments that meets or medially equals one of the listed impairments in 20 CFR Part

404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926);

4. Mr. Jackson retains the residual functional capacity to perform a range of light work. Specifically, he can lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently. He can sit, stand and/or walk for 6 hours each in an 8-hour workday. He can never crawl and can never use ladders, ropes, or scaffolds. He cannot reach in any direction with his right upper extremity, which is his dominant arm. However, handling, fingering and feeling are normal bilaterally. He is limited to tasks that are simple, routine, and low-stress and that involve only limited and superficial interaction with supervisors and coworkers and no interaction with the public. He is precluded from tasks that involve high production quotas or strict time requirements;

5. Mr. Jackson has no past relevant work (20 CFR 416.965);

6. Mr. Jackson was born on July 13, 1955 and was 49 years old, which is defined as a younger individual age 18-49, on the date the application was filed. He attained age 50 on July 12, 2005, and is considered closely approaching advanced age 50-54 since that date (20 CFR 416.963);

7. Mr. Jackson has a limited education and is able to communicate in English (20 CFR 416.964);

8. Transferability of job skills is not an issue because Mr. Jackson does not have past relevant work (20 CFR 416.968);

9. Considering Mr. Jackson's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform (20 CFR 416.960(c) and 416.966); and

10. Mr. Jackson has not been under a disability, as defined in the Social Security Act, since October 5, 2004, the date the application was filed (20 CFR 416.920(g).

(Tr. 16, 17, 24, 25).

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  See *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124,

12

125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI. Analysis

Jackson alleges the ALJ erred by failing to accord proper weight to the opinions of his treating physician and examining physician. He also alleges that the case should be remanded for consideration of equivalency with Listing 12.05(C). The Commissioner disputes these allegations.

### *A. Treatment of Medical Opinions*

The medical opinion of treating physicians should be given greater weight than those of physicians hired by the Commissioner. *Lashley v. Secretary of Health and Human Servs.*, 708 F.2d 1048 (6th Cir. 1983). Medical opinions are statements about the nature and severity of a patient's impairments, including symptoms, diagnosis, prognosis, what a patient can still do despite impairments, and a patient's physical or mental restrictions. 20 C.F.R. § 404.1527(a)(2). This is true, however, only when the treating physician's opinion is based on sufficient objective medical data and is not contradicted by other evidence in the record. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370

13

& n.7 (6th Cir. 1991); *Sizemore v. Secretary of Health and Human Services*, 865 F.2d 709, 711-12 (6th Cir. 1988). Where there is insufficient objective data supporting the treating physician's opinion and there is no explanation of a nexus between the conclusion of disability and physical findings, the fact finder may choose to disregard the treating physician's opinion. *Landsaw v. Secretary of Health and Human Servs.*, 803 F.2d 211, 212 (6th Cir. 1986). The fact finder must, however, articulate a reason for not according the opinions of a treating physician controlling weight. *Shelman v. Heckler*, 821 F.2d 316 (6th Cir. 1987).

Even when a treating physician's opinion is found not to be entitled to controlling weight, it is still entitled to deference:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Social Security Ruling 96-2p, 1996 WL 374188, at *4.

When the adjudicator determines that the treating source's opinion is not entitled to controlling weight, he is required to articulate good reasons for the weight given to the treating source's medical opinion. 20 C.F.R. §§ 404.1527(d) (2) and 416.927.

> [T]he ...decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

Social Security Ruling 96-2p, 1996 WL 374188, at *5.

14

The ALJ gave Dr. Ganz's opinion little weight because he found that it is not supported by the objective medical evidence and is contradicted by other evidence in the record, including Dr. Ganz's treatment notes.  The ALJ's findings are supported by substantial evidence.  Dr. Ganz stated that Jackson's limitations were the result of his osteoarthritis, severe joint disease, hypertension, and chronic obstructive pulmonary disease. However, the ALJ found that,  "[ Dr. Ganz's] treatment notes were spare and provided absolutely no basis for the extreme limitations he offers."  (Tr. 23). Specifically, the ALJ noted that there is no objective testing establishing that Jackson has osteoarthritis, and it appears that Dr. Ganz accepted Jackson's statements that he had this disease without performing any independent testing.  In support of his conclusion, the ALJ noted that Dr. Ganz had not prescribed any sort of physical therapy for Jackson's alleged disabling problems, nor offered any other course of treatment. Additionally, Dr. Ganz failed to even mention osteoarthritis anywhere in his treatment notes.  The ALJ also noted that Jackson's chest X-rays were normal, his headaches were controlled with over the counter medication, and his hypertension was well controlled.  The ALJ found that this lack of objective medical evidence outweighed the significance of Dr. Ganz's longitudinal history with Jackson.

The ALJ further found that Dr. Krause's medical opinion was unremarkable except for the finding of a congenital arm defect.  However, Dr. Krause did not offer any specific functional limitations based on the defect, but rather opined that Jackson was limited to sedentary work.  The ALJ properly discredited this opinion because it offers vocational limitations that are outside Dr. Krause's area of expertise.  20 C.F.R. 416.903 20; C.F.R. 416.927(e); 387, 390 (6th Cir. 2004).

15

As the forgoing illustrates, the ALJ gave specific reasons, which were supported by substantial evidence in the record, for rejecting Dr Ganz's and Dr. Krause's opinions. Accordingly, Jackson's argument is without merit.

### *B. Medical Equivalency*

Jackson argues that this case should be remanded to obtain testimony from a medical expert in order to determine whether Jackson's impairments equal Listing 12.05(C), 20 C.F.R. Pt. 404, Subpt P, App. 1, § 12.05C (mental retardation)[2]. Pursuant to Social Security Ruling 83-19, 1983 WL 31248, an impairment equals a listed impairment when: (1) one of the required medical findings is missing but other medical findings of equal or greater significance relating to the same impairment is present; (2) an unlisted impairment equals a listed impairment; and (3) a combination of impairments is equal to a listed impairment.  A physician designated by the Secretary is required to decide whether an individual's impairments equal a listed impairment. Social Security Ruling 83-19 *2.  Further, any finding of equivalence must be based on findings demonstrated by medically acceptable diagnostic techniques.  *Id.* at *3.

Jackson argues that the case should be remanded to obtain medical testimony regarding the issue of equivalency to Listing 12.05(c).  Jackson asserts that although

---

[2]Listing 12.05 provides in part:
Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22 [with] . . . .

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

16

his IQ scores do not meet the listed criteria, these scores, together with other evidence in the record demonstrate that he is mildly mentally retarded.  Jackson's argument misses the mark.  Two state agency medical experts have already determined that Jackson's impairments do not equal Listing 12.05(C) (Tr. 197-210; 230-247); and the ALJ properly relied upon their opinions.  Accordingly, the ALJ's step three finding is supported by substantial evidence, and remand is not warranted.

## VII.  Decision

For the foregoing reasons, the decision of the Commissioner is supported by substantial evidence.  Accordingly, the decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.

> s/*Nancy A. Vecchiarelli*
> Nancy A. Vecchiarelli
> U.S. Magistrate Judge

Date: September 1, 2009